**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **ASHIA JONES** on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION** and **JPMORGAN CHASE U.S. BENEFITS EXECUTIVE**,<br><br>Defendants. | **Civil Action No.:**<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Ashia Jones ("Plaintiff"), individually and on behalf of the Class defined below of similarly situated persons, alleges the following against JPMorgan Chase Bank, N.A. ("JPMorgan") and the JPMorgan Chase Benefits Executive (collectively, Defendants) based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

## NATURE OF THE ACTION

1. It is both unfair and unlawful for entities like JPMorgan to impose discriminatory and punitive health insurance surcharges on employees who use tobacco products. This lawsuit challenges Defendants' unlawful practice of charging a "tobacco surcharge" under the JPMorgan Chase Health and Wellness Centers Plan (the "Plan")[1] in a manner that violates the Employee Retirement Income Security Act of 1974 ("ERISA") and the implementing regulations. ERISA permits health-contingent wellness programs if, and ***only if***, such programs strictly comply with

[1] The Plan is described in participant-facing materials as the "JPMorgan Chase U.S. Medical Plan." Regardless of nomenclature, the Plan governs the premium contributions, including the tobacco surcharge and wellness program requirements challenged in this action.

the criteria governing these programs, including: (i) offering a meaningful and accessible reasonable alternative standard to any individual being charged extra based on a health factor; (ii) clearly disclose the availability of that alternative standard in "all plan materials" describing the surcharge; and (iii) provide the "full reward," meaning the entire difference between the tobacco-user and non-tobacco-user contribution levels. *See* 29 U.S.C. § 1182; 42 U.S.C. § 300gg-4(j). Instead, Defendants impose a discriminatory tobacco surcharge without providing participants with a *reasonable* alternative standard and fail to provide proper notice, violating federal regulations and depriving employees of benefits to which they are entitled under ERISA.

2. Tobacco surcharges have become more prevalent in recent years but to be lawful plans must make available a *compliant* "wellness programs" that provides employees with an avenue to avoid the surcharge. Making a compliant wellness program available means employers ***must*** adhere to strict rules set forth by ERISA and the implementing regulations established by the Departments of Labor, Health and Human Services, and the Treasury (collectively, the "Departments") over ten years ago in 2014. ERISA imbues the Departments with the authority to promulgate regulations interpreting ERISA § 702, 29 U.S.C. § 1182, the statute's non-discrimination provision. Accordingly, the Departments have developed a regulatory framework that "must be satisfied" to qualify for the statutory exception or safe harbor. Employers can only invoke this safe harbor if they can demonstrate full compliance with all the requirements. Moreover, while courts are no longer required to defer to an agency's interpretation of an ambiguous *statute* under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), courts must still defer to an agency's interpretation of its own *regulations*, if that interpretation is neither plainly erroneous nor inconsistent with the regulatory framework. *Auer v. Robbins*, 519 U.S. 452 (1997); *Kisor v. Wilkie*, 588 U.S. 558 (2019).

3. ERISA's strict regulatory requirements are meant to ensure that wellness programs actually promote health and preclude discrimination, instead of wellness programs that are "subterfuge[s] for discriminating based on a health factor."[2] The Final Regulations establish that for plans to be compliant, they must provide a clearly defined, reasonable alternative standard that allows participants to obtain the "full reward," including retroactive reimbursement of surcharges paid while completing the alternative standard. *See id.*, 33159–63. First and foremost, a wellness program must be genuinely designed to improve health or prevent disease, rather than functioning as an improper penalty imposed on certain participants under the guise of a health initiative. Defendants' Plan imposes an $80 monthly tobacco surcharge through payroll deductions while failing to operate a compliant wellness program under ERISA. The Plan does not clearly or consistently establish a reasonable alternative standard that informs participants of all available avenues to avoid the surcharge Defendants impose the surcharge on employees and covered spouses who are classified as tobacco users, locks that status in for the entire plan year, and limits relief to prospective plan years only. At the same time, Defendants fail to disclose in all Plan materials that participants may qualify for the reward through a physician-directed alternative, fail to ensure that participants who complete the alternative standard receive the full reward for the Plan year, and retain surcharge amounts collected even after participants satisfy the alternative standard. In doing so, Defendants shift Plan costs onto employees based on a health factor without satisfying the requirements needed to take advantage of ERISA's safe harbor.

4. The need for regulatory safeguards surrounding these types of wellness programs is underscored by studies showing little evidence that wellness programs effectively reduce

---

[2] *Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158, 33163 (June 3, 2013) (hereinafter the "**Final Regulations**").

healthcare costs through health improvement. Instead, the savings employers claim often result in cost-shifting onto employees with higher health risks, disproportionately burdening low-income and vulnerable workers who end up subsidizing their healthier colleagues.[3] The regulatory safeguards seek to prevent wellness programs from being misused as thinly veiled revenue-generating schemes at the expense of employees who are least able to afford the additional costs by shifting the burden to plan sponsors to demonstrate compliance once a participant alleges discriminatory surcharges. The goal is to ensure that wellness programs operate equitably and in a non-discriminatory manner, and to promote genuine health improvements

5. Outcome-based programs,[4] such as being tobacco-free or completing a smoking cessation program, must offer a clearly defined "*reasonable* alternative standard," which is an alternative way for "all similarly situated individuals" to obtain the reward (or avoid a penalty) if they are unable to meet the initial wellness program standard (i.e., being tobacco-free). Critically, ERISA's implementing regulations require that "the *same*, *full reward*" must be provided to individuals who complete the alternative standard, regardless of when they do so during the plan year.[5] The Department of Labor ("DOL") has made clear that participants should not be forced to

---

[3] Horwitz, J. R., Kelly, B. D., & DiNardo, J. E. (2013). *Wellness incentives in the workplace: Cost savings through cost shifting to unhealthy workers*. Health Affairs, 32(3), 468–476, 474 ("wellness programs may undermine laws meant to prevent discrimination on the basis of health status. Since racial minorities and people with low socioeconomic status are more likely than others to have more health risks, they are also more likely to be adversely affected by cost shifting"); *see also* Dorilas, E., Hill, S. C., & Pesko, M. F. (2022). *Tobacco surcharges associated with reduced ACA marketplace enrollment*. Health Affairs, 41(3), Abstract (finding that tobacco surcharges are significant barriers to affordable health insurance).

[4] "An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward." 29 C.F.R. § 2590.702(f)(1)(v).

[5] *See* Final Regulations, 33163 ("while an individual may take some time to request, establish, and

rush through the program under the threat of continued surcharges and that every individual participating in the program must receive the same reward as provided to non-smokers. *Id.* The Departments made this requirement clear when they stated it is "[t]he intention of the Departments . . . that, regardless of the type of wellness program, ***every individual participating in the program*** should be able to receive ***the full amount of any reward or incentive*** . . . ." *Id.*, 33160 (emphasis added). Defendants violate these requirements by failing to provide a reasonable alternative standard that provides full reimbursement to employees who complete it, operating a non-compliant penalty structure rather than a lawful wellness incentive, and failing to clearly notify participants of all the avenues available to them to avoid the surcharge, including benefit guides, plan documents, and summary plan descriptions ("SPDs"). *Id.* These failures constitute direct violations of ERISA's wellness program regulations.

6. Defendants cannot qualify for the statutory safe harbor because, while they impose a health-based surcharge, they do not make available to participants (or notify them of) a compliant wellness program. The Plan fails to satisfy the essential regulatory criteria, which "***must*** be satisfied," (*Id.*, 33160; emphasis added) for a wellness program to be lawful under ERISA. Final Regulations, 33160. The core deficiency of Defendants' wellness program is that it does not offer a reasonable alternative standard that makes available the "full reward" to all participants who complete it, as explicitly required by 42 U.S.C. § 300gg-4(j)(3)(D) and 45 C.F.R. § 146.121(f)(4)(iv). While the Plan offers a smoking cessation program, there is no mention of

---

satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual*** as is provided to individuals who meet the initial standard for that plan year. (For example, if a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.)" (emphasis added)).

reimbursement or that participants will receive the same reward as non-smokers upon completion. To that extent, Defendants fail to make available a clearly defined, *reasonable* alternative standard that ensures employees who satisfy that standard receive a full refund of the $80 monthly surcharges that are deducted from their paychecks. Instead, Defendants use these unlawfully obtained funds to offset JPMorgan's own contributions to the Plan, which allows additional money to remain in its accounts on which the company earns interest. By increasing participant contributions through this surcharge, Defendants reduce JPMorgan's contributions to the Plan that would otherwise be required to fund the same coverage.

7. Defendants' wellness program is also unreasonable because it conditions a participant's required premium contributions on a dependent's health status. Under the Plan, an employee's payroll contributions increase not only if the employee is classified as a tobacco user, but also if the employee's covered spouse or domestic partner is classified as a tobacco user. As a result, even a tobacco-free employee who satisfies all requirements applicable to the employee personally is denied the full reward unless the spouse separately completes Defendants' tobacco cessation program or otherwise qualifies as a non-tobacco user. This violates ERISA's anti-discrimination rules because it conditions a participant's cost of coverage on a dependent's health factor. *See* 29 U.S.C. § 1182(b)(1); 29 C.F.R. § 2590.702(c)(1). ERISA's wellness program regulations require that any reasonable alternative standard be made available to the individual participant and do not permit an employer to deny the full reward, or continue to impose a surcharge, based on the conduct or health status of a spouse or other dependent. *See* 29 C.F.R. § 2590.702(f)(4)(iii). Because a participant's premium contributions remain elevated unless a third party independently satisfies the health-contingent condition, Defendants operate a wellness program that is neither uniformly available nor compliant with ERISA's safe harbor.

8. Defendants also violate ERISA's wellness program regulations by failing to provide the notice required by statute and regulation, which is an independent basis for liability. Federal law requires that a plan "disclose in ***all plan materials*** describing the terms of the wellness program the availability of a reasonable alternative standard." 42 U.S.C. § 300gg-4(j)(3)(E) (emphasis added). JPMorgan Chase's participant-facing materials—including its annual benefits guides and summaries—describe the tobacco surcharge and the higher premium contributions imposed on tobacco users, but do not clearly and affirmatively disclose all of the ways in which participants may qualify for the reward. Specifically, Defendants' plan materials fail to inform participants that they may satisfy any alternative standard through a physician-directed accommodation, as expressly required by the wellness program regulations. *See* 45 C.F.R. § 146.121(f)(4)(v). Nor do the materials participants rely upon during enrollment explain how completion of the tobacco cessation program entitled participants to relief from surcharges already assessed. Instead, the Plan's materials state that tobacco user status is locked for the plan year and that lower non-tobacco rates apply only prospectively beginning January 1 of a future plan year, without disclosing any mechanism for earning the full reward during the year in which the surcharge is imposed. To that extent, the notice provided to participants may be of an alternative standard but that standard is not reasonable.

9. These disclosure failures are not technical defects. The Final Regulations make clear that where a plan imposes a premium differential based on tobacco use, its disclosures must include notice of the availability of a reasonable alternative standard and physician involvement. *See* Final Regulations, 33166 ("a plan disclosure that references premium differential based on tobacco use . . . must include this disclosure").. Because Defendants' Plan materials do not contain these required disclosures, Defendants cannot invoke ERISA's wellness program safe harbor as

an affirmative defense. The tobacco surcharge imposed through the Plan therefore constitutes unlawful discrimination based on a health-status-related factor in violation of ERISA

10. Because Defendants impose a monthly tobacco surcharge of $80 but does not make available a *reasonable* alternative standard or provide the required notice in all Plan materials discussing the surcharge, the Plan fails to satisfy the essential regulatory criteria, which "***must*** be satisfied." Final Regulations, 33160. Defendants do not provide compliant notice in all Plan materials, in violation of ERISA's wellness program rules. As a result, the surcharge functions as a penalty rather than a compliant wellness incentive and Defendants cannot qualify for the statutory safe harbor. This is not a minor technical failure; it is a fundamental violation of ERISA's core anti-discriminatory purpose: ensuring that participants have a fair and compliant opportunity to be treated the same as non-smokers.

11. This Complaint alleges that Defendants impose a health-based tobacco surcharge without making available a compliant alternative standard to avoid the surcharge. Defendants bear the burden of proving that their tobacco surcharge is lawful by showing that their wellness program fully complies with ***every*** requirement under ERISA, including making available a *reasonable* alternative standard and informing participants of all the avenues available to them to avoid the surcharge. Not informing participants that there are avenues available to them to avoid the surcharge makes the surcharge facially noncompliant. No amount of *post hoc* justifications can cure this fundamental defect. This type of discrimination is permissible only if employers meet strict criteria, which Defendants do not. Defendants' Plan is not a "program[] of health promotion or disease prevention" as required by ERISA but instead an impermissible cost-shifting scheme that unlawfully penalizes employees for their health status.

12. Participants like Ms. Jones are permitted to challenge a surcharge when there is no compliant wellness program made available or when employers provide deficient or misleading information. Once a participant alleges that a surcharge violates ERISA's anti-discrimination provisions and alleges facts to support the deficiency in the wellness program, the burden shifts to the employer to demonstrate that its wellness program fully satisfies all the statutory and regulatory criteria, including the obligation to make available the "full reward" and to notify participants of the same. *See Cunningham v. Cornell Univ*., 145 S. Ct. 1020, 1029 (2025) (reaffirming "that 'the burden of persuasion as to certain elements of a plaintiff 's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses or *exemptions*.'").

13. Plaintiff was an employee of JPMorgan who paid the unlawful tobacco surcharge to maintain health insurance coverage under the Plan. This surcharge imposed an additional financial burden on Plaintiff and continues to impose such a burden on those similarly situated.

14. Plaintiff brings this lawsuit individually and on behalf of all similarly situated Plan participants and beneficiaries, seeking to recover these unlawfully charged fees and for Plan-wide equitable relief to prevent Defendants from continuing to profit from its violations under 29 U.S.C. § 1109. Under 29 U.S.C. § 1109, Defendants are fiduciaries of the Plan who have a legal obligation to act in the best interests of Plan participants and to comply with federal law. Plaintiff, on behalf of herself and the Plan as a whole, seeks appropriate equitable relief under 29 U.S.C. §§ 1132(a)(2) and (a)(3) to address Defendants' ongoing violations of ERISA's anti-discrimination provisions.

**PARTIES**

15. Plaintiff Ashia Jones is, and at all times mentioned herein was, an individual citizen of the State of Texas residing in the County of Tarrant. Plaintiff was an employee of Defendant, who paid a tobacco surcharge of $40 per paycheck (roughly $960 annually) associated with the

Plan. Plaintiff was required to pay this tobacco surcharge to maintain health insurance under the Plan.

16. Plaintiff is a participant in the Plan pursuant to 29 U.S.C. § 1002(7).

17. Defendant JPMorgan is a national banking association chartered under the laws of the United States. At all relevant times, JPMorgan maintained a substantial operational presence in New Jersey and, upon information and belief, maintained its benefits administration functions in Jersey City, New Jersey. Upon information and belief, JPMorgan exercised discretionary authority and control over the administration of the Plan and the assessment of participant contributions and therefore acted as a Plan fiduciary within the meaning of ERISA. At all times relevant to this lawsuit, Defendant sponsored, maintained, and managed the Plan. Defendant employs over 300,000 individuals globally. As of December 31, 2024, there were over 185,000 participants in the Plan. Defendants' employee benefit plan is subject to the provisions and statutory requirements of ERISA pursuant to 29 U.S.C. § 1002(3).

18. Defendant JPMorgan Chase Benefits Executive ("Benefits Executive") is identified in Defendants' Form 5500 filings as the Plan administrator responsible for the administration of the employee welfare benefit plan at issue. Upon information and belief, the Benefits Executive is located in Jersey City, New Jersey and is responsible for overseeing, and exercised discretionary authority and control over, Plan administration, participant communications, and compliance with ERISA's reporting, disclosure, and nondiscrimination requirements; it is a fiduciary within the meaning of ERISA.

## JURISDICTION AND VENUE

19. The Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, as this suit seeks relief under ERISA, a federal statute. Upon information and

belief, the number of class members is over 1,000, many of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

20. This Court has personal jurisdiction over Defendants because they have purposefully availed themselves of the privilege of conducting business in New Jersey and have continuous and systematic contacts with this State. As reflected in Defendants' Form 5500 filings, Defendants maintain benefits administration functions in Jersey City, New Jersey, and exercise authority over the administration of the employee benefit plan at issue from this District. Plaintiff's claims arise directly from Defendants' Plan-related conduct directed to and carried out in New Jersey.

21. Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District, Defendants conduct business in this District, and Defendants may be found in this District.

## FACTUAL BACKGROUND

### I. DEFENDANTS' TOBACCO SURCHARGE VIOLATES ERISA'S ANTI-DISCRIMINATION RULE

#### A. Statutory and Regulatory Requirements

22. To expand access to affordable health insurance coverage, the Affordable Care Act ("ACA") amended ERISA to prohibit any health insurer or medical plan from discriminating against participants in providing coverage or charging premiums based on a "health-related factor," including tobacco use. Under this rule, a plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution that is greater than such premium or contribution for a similarly situated individual enrolled in the plan based on any health-related factor in relation to the individual or to an individual enrolled

under the plan as a dependent of the individual." ERISA § 702(b)(1), 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1).

23. The statute permits group health plans to "establish[] premium discounts or rebates . . . in return for adherence to ***programs of health promotion and disease prevention***" (29 U.S.C. § 1182(b)(2)(B) (emphases added)); however, these "wellness programs"—to qualify for this statutory safe-harbor exception—must strictly adhere to the mandated regulatory requirements.

24. Under ERISA § 505, 29 U.S.C. § 1135, Congress granted the Department of Labor the authority to issue regulations, including the power to establish regulations prohibiting discrimination against participants and beneficiaries based on their health status under ERISA § 702, 29 U.S.C. § 1182. This authority empowers the Secretary of Labor (the "Secretary") to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of" Title I of ERISA. (29 U.S.C. § 1135). Furthermore, ERISA § 734, 29 U.S.C. § 1191c, explicitly reinforces the Secretary's authority to issue regulations concerning group health plan requirements, which grants the power to "promulgate such regulations as may be necessary or appropriate to carry out the provisions" of ERISA Title I, Part 7. 29 U.S.C. § 1191c.

25. Exercising this delegated authority, in 2006, the Secretary issued regulations through the notice-and-comment rulemaking process outlining the criteria that a wellness program must meet to qualify for the premium non-discrimination exception under ERISA § 702(b). *See* Final Regulations, 33158–59. Following the amendments by the ACA and Public Health Service Acts, in 2010, the Departments published proposed regulations in November 2012 to "amend the 2006 regulations regarding nondiscriminatory wellness programs." *Id.*, 33159. These regulations

(i.e., the Final Regulations) were approved and signed in 2013 to be effective January 1, 2014. *Id.*, 33158.

26. The Final Regulations specify that health promotion or disease prevention programs, such as outcome-based wellness initiatives (i.e., smoking cessation programs), must meet detailed requirements to qualify for the statutory safe harbor. As the Departments explained, these criteria "***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *Id.*, 33163 (emphasis added). "That is," the Departments explained, "these rules set forth criteria for an ***affirmative defense*** that can be used by plans and issuers in response to a claim that the plan or issuer discriminated" against participants. *Id.* (emphasis added). That means once a participant alleges a discriminatory surcharge along with facts showing that the alternative standard offered to them is deficient, the burden then shifts to the employer to prove that the wellness program satisfies *all* the necessary criteria.

27. The criteria in the Final Regulations are not optional. They serve as the only lawful pathway for plans to impose health-based premium differentials by ensuring that wellness programs do not arbitrarily penalize participants and they prevent employers from using surcharges as a revenue-generating mechanism rather than a genuine tool for health promotion. If a wellness program fails to meet even one of these stringent requirements, the program is noncompliant and the employer cannot benefit from the statutory carve-out. *See* § 2590.702(f)(4) (describing the "[r]equirements for outcome-based wellness programs," stating that a program "does not violate the provisions of this section ***only if all of the [] requirements are satisfied***." (emphasis added)).

**B. Regulatory Criteria**

28. To comply with ERISA and avoid unlawful discriminatory surcharges, outcome-based wellness programs must meet the following five (5) criteria:

(a) Frequency of opportunity to qualify: Participants must be given at least one chance annually to qualify for the reward associated with the program to ensure ongoing accessibility and fairness. 29 C.F.R. § 2590.702(f)(4)(i).

(b) Size of reward: penalties or rewards cannot exceed 50% of the cost of employee-only coverage. § 2590.702(f)(4)(ii)

(c) Reasonable design: programs must be "reasonably designed" to promote health and cannot be "a subterfuge for discriminating based on a health factor." This determination is based on all the relevant facts and circumstances. "To ensure that an outcome-based wellness program is reasonably designed to improve health and does not act as a subterfuge for underwriting or reducing benefits based on a health factor, a reasonable alternative standard to qualify for the reward must be provided to any individual who does not meet the initial standard based on a measurement, test, or screening. . . ." § 2590.702(f)(4)(iii)).

(d) Uniform availability and reasonable alternative standards: "The full reward under the outcome-based wellness program must be available to all similarly situated individuals." § 2590.702(f)(4)(iv).

(e) Notice of availability of reasonable alternative standard: notice must include (a) instructions on how to access the reasonable alternative standard; (b) contact information for inquiries about the alternative standard; and (c) an explicit statement that participants' personal physician's recommendations will be accommodated. *See* § 2590.702(f)(4)(v).

29. The Departments provided valuable insight into each of the criteria, reflecting their intent to operationalize the statute's protections in a manner that both promotes health and prevents discriminatory practices under ERISA.

30. Regarding the first criteria, "the once-per-year requirement was included as a bright-line standard for determining the minimum frequency that is consistent with a reasonable design for promoting good health or preventing disease." Final Regulations, 33162. The once-per-year requirement ensures that participants have a meaningful opportunity to participate in a reasonable alternative standard.

31. A key requirement of the fourth criterion for outcome-based programs is that the "full reward" must be available to "all similarly situated individuals[,]" regardless of when they meet the reasonable alternative standard during the plan year. *See* Final Regulations, 33165. Critically, the Departments clearly state that it is "[t]he intention of the Departments . . . that, regardless of the type of wellness program, ***every individual*** participating in the program should be able to receive the ***full amount of any reward or incentive***. . . ." *Id.* (emphases added). While plans have flexibility in determining the manner in which they provide the "full reward," providing the "full reward" to every participant is ***mandatory***, regardless of when the participant satisfies the alternative standard. The Departments have made this clear:

> While an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year***. (For example, if a calendar year plan offers a . . . premium discount and an individual . . . satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.) Plans and issuers have flexibility to determine ***how*** to provide the portion of the reward corresponding to the period before an alternative was satisfied (e.g., payment for the retroactive period or pro rata over the remainder of the year) ***as long as . . . the individual receives the full amount of the reward***.

Final Regulations, 33163 (emphases added).

32. The Final Regulations provide an example of a non-compliant plan that imposes a tobacco use surcharge but does not facilitate the participant's enrollment in or participation in a smoking cessation program. *See id.*, Example 8. Instead, the employer advises the participant to find a program, pay for it, and provide a certificate of completion. *Id.* The Final Regulations conclude that the plan is not compliant because it "has not offered a reasonable alternative standard . . . and the program fails to satisfy the requirements of paragraph (f) of this section." *Id.*; Final Regulations, 33180.

33. For health contingent wellness programs, the Final Regulations require the notice be disclosed "in ***all*** plan materials describing the terms of" the program. 42 U.S.C. § 300gg-4(j)(3)(E); 45 C.F.R. § 146.121(f)(4)(v) (emphasis added). Further, the Final Regulations establish that "[f]or ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents . . . if compliance with the wellness program affects premiums . . . under the terms of the plan." Final Regulations, 33166. Plans that charge their participants more and fail to inform participants of a reasonable alternative standard to the surcharge violate these requirements.

## II. DEFENDANTS CANNOT AVAIL THEMSELVES OF ERISA'S SAFE HARBOR

34. Defendants' tobacco surcharge is discriminatory because Defendants fail to make available a compliant wellness program that would allow participants to avoid the entire surcharge during the Plan year. Under the Plan, Defendants impose an $80 monthly ($960 annually) tobacco surcharge on employees, and separately on covered spouses or domestic partners, who are

classified as tobacco users while enrolled in the Plan. The surcharge is assessed through employees' regular before-tax payroll contributions for medical coverage.

35. Defendants condition relief from the surcharge on being tobacco free for 12 months or on completion of Defendants' tobacco cessation program. However, even where a participant (or covered spouse) completes the cessation program during the Plan year, Defendants do not provide relief from the surcharge for that year. Instead, Defendants maintain the surcharge for the remainder of the plan year and apply any reduction only *prospectively*, beginning January 1 of the subsequent Plan year. Thus, Defendants deny participants the full reward required by ERISA's wellness program regulations and continue to collect tobacco surcharges even after the health-contingent condition has been satisfied.

36. Even if Defendants contend that the Plan makes the "full reward" available to participants who complete the tobacco cessation program, Defendants fail to clearly and affirmatively disclose that information to participants in the materials they are required to rely on. Defendants' benefit guides and Summary Plan Description ("SPD"), the primary documents used during enrollment, describe the tobacco surcharge and the higher premium contributions imposed on tobacco users, but do not inform participants whether completion of the cessation program during the Plan year entitles them to relief from surcharges already assessed, or whether any mechanism exists to obtain the full reward during that year. Instead, the materials state that tobacco-user status is locked for the Plan year and that lower non-tobacco rates apply only prospectively beginning January 1 of a subsequent plan year.

37. The SPD confirms that participants are not eligible for non-tobacco user rates until *after* completing the tobacco cessation program, reinforcing the absence of any retroactive relief. The SPD states that "[u]pon completion of the program, you may be eligible for lower 'non-

tobacco user' rates." This language expressly conditions eligibility for lower rates on completion of the program as a forward-looking event and nowhere suggests that completing the program during the Plan year entitles participants to relief from surcharges already assessed or paid. To the contrary, the SPD communicates a temporal linkage between completion and future eligibility, confirming that Defendants do not make the full reward available on a retroactive basis.

38. Defendants likewise fail to disclose in the benefits guides or the SPD that participants may satisfy any alternative standard through a physician-directed accommodation, as required by the wellness program regulations. *See* 45 C.F.R. § 146.121(f)(4)(v). The SPD does not include the required statement that participants' physicians' recommendations will be accommodated. Defendants' failure to do so independently disqualifies the Plan from ERISA's wellness program safe harbor. The following show Defendants' SPD (Ex. 1) and benefit guide section (Ex. 2) discussing the tobacco surcharge:

Ex. 1

## Tobacco User Status

Employees and their covered spouses/domestic partners who do not use tobacco products pay less for medical coverage. Each year, employees must verify their status as a non-tobacco user or tobacco user, as well as the status of their covered spouse/domestic partner. To be considered a non-tobacco user and pay lower, non-tobacco user rates under the Medical Plan for a plan year, you and/or your covered spouse/domestic partner must either:

- Be tobacco-free for at least 12 months as of January 1 of that plan year; or
- Complete an approved tobacco cessation program.

If you continue to use tobacco, you will need to complete the Quit for Life tobacco cessation program offered free of charge by JPMorganChase annually to continue to qualify for the lower, non-tobacco user rates. If you and/or your covered spouse/domestic partner meet the definition of a tobacco user but fail to declare your tobacco user status, you may be subject to disciplinary action.

**Please Note:** In your first calendar year of employment, you will be assigned non-tobacco user rates for you and your covered spouse's/domestic partner's coverage for the current plan year. This assignment applies even if you declare yourself and/or your covered spouse/domestic partner as tobacco users, because you may not have had an opportunity to complete a tobacco cessation program to qualify for the lower non-tobacco user rates. In subsequent plan years, however, you will be eligible for non-tobacco user rates only if you have been tobacco-free for 12 months (as of January 1) or if you complete the Quit for Life tobacco cessation program, as described in the preceding paragraph.

If you were hired after September 1, for the current plan year and in the next plan year, you will be assigned non-tobacco user rates for you and your covered spouse's/domestic partner's coverage even if you declare yourself and/or your covered spouse/domestic partner as a tobacco user. This assignment applies because you may not have had an opportunity to complete a tobacco cessation program to qualify for the lower non-tobacco user rates.

You'll receive more information about the opportunity to update your tobacco user status during each Annual Benefits Enrollment.

For more information on the Tobacco Cessation Program, type go/Wellness on the JPMC's intranet browser.

| How Tobacco User Is Defined |
| --- |
| Under the JPMorgan Chase Medical Plan, a "tobacco user" (for a plan year) is any person who has used any type of tobacco products (for example, cigarettes, cigars, chewing tobacco, snuff, or a pipe), regardless of the frequency or location (this includes daily, occasionally, socially, at-home only, etc.) in the 12 months preceding January 1 of the plan year. |

Ex. 2.

## Higher Rates for Tobacco Users for Certain Benefits Coverage

All U.S. benefits-eligible employees (and their covered spouses/domestic partners, where applicable) who use tobacco will pay higher rates under the following Health Care and Insurance Plans:

- Medical Plan (employee and spouse/domestic partner coverage);
- Supplemental Term Life Insurance Plan (employee and spouse/domestic partner coverage);
- Long-Term Disability Plan (employee coverage); and
- Individual Disability Insurance.

If you use tobacco, you will pay an additional $80 per month (or $960 per year) under the Medical Plan. If your covered spouse/domestic partner also uses tobacco, you will pay an additional $80 per month (or $960 per year) under the Medical Plan. Under the JPMorgan Chase Medical Plan, a "tobacco user" (for a plan year) is any person who has used any type of tobacco products (i.e., cigarettes, cigars, chewing tobacco, snuff or a pipe) regardless of the frequency or location (this includes daily, occasionally, socially, at home only, etc.) in the 12 months preceding January 1 of the plan year.

When you enroll as a newly eligible employee or during a subsequent annual enrollment period, you will declare a non-tobacco user/tobacco user status for yourself and your covered spouse/domestic partner. The status you report will remain in effect for the calendar year. After you (and/or your covered spouse/domestic partner) have been tobacco free for 12 months (as of January 1 each year) or completed the Quit For Life Tobacco Cessation Program by the applicable deadline (as part of the Annual Benefits Enrollment process), you'll be eligible for lower non-tobacco user rates beginning January 1 of the following year.

If you become eligible for benefits coverage before September 1, you will be assigned non-tobacco user rates[16] for the current calendar year for you and your covered spouse/domestic partner even if you declare yourself and/or your spouse/domestic partner a tobacco user, because you and/or your spouse/domestic partner may not have had an opportunity to complete a Tobacco Cessation Program in order to qualify for the lower non-tobacco user rates. You'll receive more information regarding the opportunity to update your tobacco user status during the annual benefits enrollment period. More information on Tobacco Cessation Programs and requirements is available on **go/wellness** > Health Services & Resources > Tobacco Cessation.

If you become eligible for benefits coverage after September 1, for the current plan year and the following plan year you will be assigned non-tobacco user rates for your and your spouse's/domestic partner's coverage for certain benefits.

[16]Upon enrolling in Individual Disability Insurance (IDI), employees will be asked their tobacco user status to determine their rate for coverage. Those who are tobacco free for 12 months at enrollment will have the non-tobacco user rate. All others may qualify for the lower non-tobacco user rate in the future by completing the Quit For Life Tobacco Cessation Program or being tobacco free for 12 months.

39. As shown, Defendants' participant-facing materials omit the required statement that participants' personal physicians' recommendations will be accommodated. The absence of this language, alone, renders the program noncompliant. The SPD is the primary vehicle through which participants are informed of Plan terms affecting premiums and contributions. Because the tobacco surcharge directly implicates participants' contributions rates, it must include compliant notice, including a statement of accommodation of a participant's personal physician's recommendations. Yet, neither the SPD nor the benefit guide contains the physician-accommodation disclosure and neither inform participants that they may qualify for the full reward upon satisfying an alternative standard. These omissions independently violate ERISA's wellness program regulations and foreclose Defendants from invoking the statutory safe harbor. By failing to provide such basic instructions where the surcharge is described, Defendants' wellness program

is opaque, inaccessible, and practically unusable as a reasonable alternative standard. Upon information and belief, Defendants fail to provide compliant notice in other participant-facing communications discussing the tobacco surcharge.

40. Federal regulations require that outcome-based wellness programs tied to tobacco use be reasonably designed to improve health, uniformly available to all similarly situated individuals, and supported by a reasonable alternative standard that affords the same full reward regardless of when the participant satisfies the alternative during the plan year. They also require clear notice. Defendants' program, as communicated in its own materials, fails these mandates. It offers only go-forward relief upon completion of a cessation program and is silent about retroactive make-whole relief for surcharges already paid and accommodation of a participant's physician's recommendations.

41. Defendants should have included clear and explicit disclosure of the right to have an individuals' physician involved and that participants would be fully reimbursed for any surcharges they paid prior to completing the program. Had Defendants included that information, participants like Plaintiff could have taken steps to avoid the surcharge.

42. Plaintiff paid the tobacco surcharge and was never informed by Defendants or anyone acting on their behalf that completing the tobacco cessation program would result in relief from the surcharge for the Plan year in which the surcharge was imposed. To the contrary, when Ms. Jones raised questions about the surcharge with her manager, she was told that she could qualify for lower non-tobacco rates only *after* completing the program and only on a prospective basis. She was not told that completion of the program could entitle her to relief from surcharges already paid, nor was she informed of any right to seek accommodation through her personal physician. As a result, participants are led to believe—as Ms. Jones was—that the surcharge must

be paid for the entire Plan year regardless of when the alternative standard is satisfied. Defendants' failure to disclose all available avenues to avoid or mitigate the surcharge deprived Plaintiff and other participants of the information necessary to make informed benefit decisions and independently disqualifies the Plan from ERISA's wellness program safe harbor

43. The lack of required disclosures and clarity, coupled with a punitive surcharge and only prospective relief upon completion, reflects a program designed and administered in such a way as to be more for revenue generation and cost shifting than for bona fide health promotion. By omitting material information and required disclosures, Defendants deprived participants of the ability to make informed choices about their health coverage and financial obligations, violating the regulatory framework governing wellness programs and ERISA's fiduciary duties of loyalty and prudence.

44. Allowing entities like JPMorgan to exploit its participants and unlawfully extract millions of dollars annually from them without making available a compliant wellness program transforms the surcharge into a "subterfuge for discrimination" and undermines ERISA's purpose of protecting workers from health-based discrimination. If unchecked, this practice would permit employers to manipulate wellness programs as revenue-generating schemes rather than genuine health initiatives, shifting unjust financial burdens onto employees in violation of federal law. This type of conduct violates not only ERISA's antidiscrimination rules governing wellness programs but also the statute's fiduciary duties of loyalty and prudence, as Defendants failed to administer the Plan solely in the interest of participants.

## III. DEFENDANTS' SELF-DEALING AND MISMANAGEMENT OF PLAN FUNDS

45. Defendants administered the tobacco surcharge by designating which participants are charged and withholding the surcharge directly from participants' paychecks as a before-tax

plan contribution, alongside required premium deductions. These deductions are part of the funding stream for Plan coverage, not separate penalties, and are treated the same way as other contributions made to support the Plan's medical benefits.

46. The governing Plan documents make clear that medical coverage is funded by both employer and participant contributions. Defendants commit a defined company contribution amount toward the cost of coverage, with participants paying the balance. By layering a tobacco surcharge on top of those required participant contributions, Defendants created what should have been a third stream of funding available to the Plan: (1) participants' required premium contributions, (2) Defendants' promised company contribution amount, and (3) the additional tobacco surcharge. But instead of allowing all three funding streams to flow into the Plan, Defendants used the tobacco surcharge to offset or reduce its own funding obligation. Because the cost of coverage for each tier is fixed, every dollar of surcharge collected reduced the company's contribution dollar-for-dollar. Thus, rather than increasing resources available to the Plan, the surcharge simply shifted costs away from Defendants and onto participants.

47. This practice constitutes classic self-dealing because Defendants used the mechanisms of the Plan to realize savings for JPMorgan, depriving the Plan of the full benefit of the three distinct funding streams it should have received. Defendants' actions caused the Plan to lose the very employer contributions it was otherwise supposed to receive, in violation of ERISA's fiduciary duty standards.

48. In doing so, Defendants failed to act solely in the interest of participants and beneficiaries, as ERISA requires. Rather than use the surcharge proceeds to, for example, offset the premiums of non-smokers, Defendants used the funds to save money for itself. Upon information and belief, the money that Defendants did not have to contribute to the Plan sat in its

accounts and earned interest, while the Plan was deprived of the full amount of funding it should have received, stripping the Plan of employer dollars it was owed and converting those savings into financial benefit for Defendants. This diversion of funds is self-dealing, violates the duty of loyalty, and constitutes a prohibited transaction under ERISA §§ 404 and 406.

## CLASS DEFINITION AND ALLEGATIONS

49. Plaintiff brings this action individually and on behalf of all other similarly situated individuals, pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure.

50. Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> **Tobacco Surcharge Class**
> All individuals residing in the U.S. who, from 2014 to the time of judgment, paid a tobacco surcharge in connection with their participation in a health or welfare plan offered by Defendants.

51. Excluded from the Class are Defendants' officers and directors.

52. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

53. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a) and (b)(1).

54. **Numerosity**. This action is appropriately suited for a class action. The members of the Class are so numerous that the joinder of all members is impracticable. Plaintiff is informed, believes, and thereon alleges, that the proposed Class contains thousands of participants who have been damaged by Defendants' conduct as alleged herein, the identity of whom is within the knowledge of Defendants and can be easily determined through Defendants' records.

55. **Commonality**. This action involves questions of law and fact common to the Class. The common legal and factual questions include, but are not limited to, the following:

a. Whether Defendants' tobacco surcharge discriminates against participants based on a health status related factor;

b. Whether the smoking cessation program constitutes a reasonable alternative standard by which a participant could receive the "full reward" of the tobacco surcharge;

c. Whether Defendants provided the notice in ***all*** the Plan materials describing the surcharge;

d. Whether Defendants provided the required statement that participants' personal physicians' recommendations would be accommodated in all Plan materials describing the surcharge;

e. Whether Defendants' wellness program violates ERISA and the Final Regulations;

f. Whether Defendant JPMorgan breached its fiduciary duties by collecting and retaining the tobacco surcharge to offset its own contributions to the Plan;

g. Whether Defendant Benefits Executive breached its fiduciary duties by administering the Plan in a way as to refuse reimbursing participants who complete the alternative standard offered;

h. Whether Defendant JPMorgan breached its fiduciary duties by failing to periodically review the actions of the Benefits Executive to ensure compliance with the law;

i. Whether Defendants breached their fiduciary duties by failing to periodically review the terms of its wellness program and the communications sent to participants to ensure compliance with ERISA and applicable regulations;

j. The appropriate mechanisms to determine damages on a class-wide basis

56. **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class, because, *inter alia*, all Class members have been injured through the uniform misconduct described above and were charged improper and unlawful tobacco surcharge. Moreover, Plaintiff's claims are typical of the Class members' claims because Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class. In addition, Plaintiff is entitled to relief under the same causes of action and upon the same facts as the other members of the proposed Class.

57. **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff and members of the Class each participated in health and welfare plans offered by Defendants and were harmed by Defendants' misconduct in that they were assessed unfair and discriminatory tobacco surcharges. Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained competent counsel experienced in complex litigation and class action litigation. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

58. Plaintiff seeks declaratory and equitable relief on grounds generally applicable to the Class. Unless the Class is certified, Defendants will be allowed to profit from their unfair and discriminatory practices, while Plaintiff and the members of the Class will have suffered damages. Unless Class-wide declaratory relief is issued, Defendants may continue to benefit from the violations alleged, and the members of the Class will continue to be unfairly treated.

## CAUSES OF ACTION

### COUNT I
### UNLAWFUL SURCHARGE – FAILURE TO PROVIDE A REASONABLE ALTERNATIVE STANDARD
### (Violation of ERISA § 702, 29 U.S.C. § 1182(b) and PHSA 2705, 42 U.S.C. § 300gg-4(j)(3)(D); 29 C.F.R. § 2590.702(f)(4)(iv); 45 C.F.R. § 146.121(f)(4)(iv))

59. Plaintiff re-alleges and incorporates herein by reference allegations 1–58 of this Complaint.

60. Defendants unlawfully impose a tobacco surcharge on all participants who use tobacco in violation of ERISA § 702. By imposing discriminatory surcharges of $80 monthly on households with participants who use tobacco, without complying with the regulatory requirements, Defendants are violating ERISA § 702(b), 29 U.S.C. § 1182(b)(1). This discrimination stems from Defendants' decision not to provide an alternative standard that is

reasonable because the alternative standard offered does not make available the full reward to those who satisfy the alternative standard, in violation of ERISA and the Final Regulations.

61. ERISA explicitly prohibits group health plans from requiring "any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual ***or to an individual enrolled under the plan as a dependent of the individual***" *See* 29 U.S.C. § 1182(b)(1) (emphasis added). Defendants' Plan violates this prohibition because it fails to provide a *reasonable* alternative standard ensuring that participants who satisfy that standard are eligible for the full reward, as required by 29 C.F.R. § 2590.702(f)(4)(iv).

62. Participants who completed the designated cessation program were only eligible for relief on a go-forward basis in the new Plan year, contrary to ERISA's rule mandating that the "full reward" be made available to "all similarly situated individuals." ERISA requires that the full reward be available based solely on the participant's own completion of the alternative standard. Because not all "similarly situated individuals" could receive the full reward for the entire plan year upon completion of an alternative standard, Defendants' tobacco surcharge program fails to meet the requirements of 29 U.S.C. § 1182(b)(2)(B) and 29 C.F.R. § 2590.702(f).

63. Defendants' failure to make the full reward available constitutes unlawful discrimination based on a health-status-related factor and renders the surcharge an unlawful premium differential under 29 U.S.C. § 1182(b)(1).

64. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: (A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations

or (ii) to enforce any provisions of this title or the terms of the plan. *See* 29 U.S.C. § 1182(b). Because Defendants' surcharge program does not satisfy the criteria that plans ***must*** comply with to qualify as a compliant "program[] of health promotion and disease prevention," Defendants cannot qualify for the statutory safe-harbor and the tobacco surcharge is, therefore, unlawful and discriminatory. Plaintiff and Class Members are entitled to relief under ERISA § 502(a)(3).

## COUNT II
## UNLAWFUL SURCHARGE – FAILURE TO PROVIDE REQUIRED NOTICE
## (Violation of ERISA § 702, 29 U.S.C. § 1182(b) and PHSA 2705, 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v); 45 C.F.R. § 146.121(f)(4)(v))

65. Plaintiff re-alleges and incorporates herein by reference allegations 1–58 of this Complaint.

66. Defendants' tobacco surcharge program is not and was not a permissible wellness program because it failed to provide proper notice of the availability of a *reasonable* alternative standard, in violation of 29 C.F.R. § 2590.702(f)(4)(v).

67. Key Plan materials describing the surcharge did not disclose that participants who completed the cessation program would be eligible for retroactive reimbursement or the full reward for the Plan year; instead, they misleadingly stated that participants could qualify for non-tobacco user rates "upon completion of the program." If the Plan intended to provide the full reward it should have told participants as much. Defendants' plan materials also failed to include the required statement that recommendations of an individual's personal physician would be accommodated in determining a reasonable alternative standard. Further, upon information and belief, Defendants provided participants with other materials discussing the tobacco surcharge without including the necessary notice disclosures.

68. Because core, participant-facing documents describing the program and the premium differential omitted these mandatory disclosures, the tobacco surcharge program fails to satisfy the notice requirements necessary to qualify for ERISA's safe-harbor protection.

69. Defendants' imposition of the tobacco surcharge therefore constitutes unlawful discrimination based on a health-status-related factor in violation of 29 U.S.C. § 1182(b)(1) and 42 U.S.C. § 300gg-4.

70. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: (A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan. *See* 29 U.S.C. § 1182(b). Because Defendants' surcharge program does not satisfy the criteria that plans ***must*** comply with to qualify as a compliant "program[] of health promotion and disease prevention," Defendants cannot qualify for the statutory safe-harbor and the tobacco surcharge is, therefore, unlawful and discriminatory. Plaintiff and Class Members are entitled to relief under ERISA § 502(a)(3).

## COUNT III
## BREACH OF FIDUCIARY DUTY (PLAN-LEVEL RELIEF)
## (Violation of ERISA §§ 404, 406 and 409, 29 U.S.C. §§ 1104, 1106 and 1109)

71. Plaintiff re-alleges and incorporates herein by reference allegations 1–58 of this Complaint.

72. ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1); 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye

single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

73. Instead of loyally and prudently acting in the best interests of Plan participants, Defendants chose to use Plan assets to benefit JPMorgan, to the detriment of the Plan and its participants, by unlawfully withholding millions of dollars in tobacco surcharges from participants' paychecks and using these funds to offset JPMorgan's own contribution obligations. These surcharges were collected as before-tax deductions, alongside other contributions to the Plan, and thus were Plan assets from the moment of collection. Defendants breached their fiduciary duties by assessing and collecting the tobacco surcharge in violation of federal law and in violation of the terms of the Plan and then diverting those funds to reduce its own costs. The Plan should have received three funding streams: (1) employee premium contributions, (2) JPMorgan's contribution amount, and (3) the surcharge itself. But Defendants used the surcharge amounts to displace JPMorgan's own contributions shifting the costs associated with the Plan from itself to participants like Plaintiff. Upon information and belief, JPMorgan further profited by retaining those amounts in its own accounts, earning a float, and failing to remit the full employer contribution owed to the Plan.

74. Year after year, the Benefit Executive administered the Plan within the meaning of 29 U.S.C. § 1002(16) and was a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21), in that it exercised discretionary authority and discretionary control respecting the management and administration of the Plan and its surcharge programs, including the decision not to offer a compliant wellness program or compliant communications. The Benefits Executive exercised discretionary authority by deciding how surcharge proceeds were handled, funneling the surcharge funds indirectly into JPMorgan's general accounts. Upon information and belief, the Benefits

Executive also determined how to administer reimbursements and how to handle the surcharge proceeds. It also decided not to offer reasonable alternative standards that would have enabled "all similarly situated individuals" to receive the same full reward for the entire plan year. Upon information and belief, the Benefits Executive controlled and disseminated to all employees the benefit guides and other Plan communications, including the SPD, discussing the premium differential but failed to notify them of all the ways by which they could avoid the entire year of surcharges. The Benefits Executive further failed to conduct periodic or prudent reviews of its surcharge and wellness program, and the related communications to participants, to ensure compliance with ERISA and its regulations. Instead, it allowed a structurally defective wellness program to persist year after year, even though it resulted in discriminatory surcharges and deprived the Plan of the employer contributions it should have received.

75. The Benefits Executive further breached its fiduciary duties by administering a Plan that did not conform with ERISA's anti-discrimination requirements. It acted disloyally by permitting surcharge funds to reduce JPMorgan's own contribution obligations and by maintaining a program that withheld full reimbursement from participants who completed the reasonable alternative standard. It also failed to notify participants of their rights under the Final Regulations or to ensure that Plan documents contained the disclosures required by 29 C.F.R. § 2590.702(f)(4)(v). These omissions and misrepresentations are incompatible with ERISA's fiduciary mandates of loyalty, prudence, and adherence to governing law.

76. ERISA also imposes on appointing fiduciaries (i.e., JPMorgan) the duty to monitor and supervise the actions of those administering the Plan (i.e., the Benefits Executive). By allowing administrators and benefits staff to implement and maintain a non-compliant wellness program that violated ERISA's notice and full-reward requirements, JPMorgan breached its duty to

monitor. JPMorgan failed to review the program's design, the disposition of surcharge proceeds, and the accuracy of participant communications, despite its obligation to ensure the Plan's ongoing compliance with federal law.

77. Further, by withholding unlawful tobacco surcharges from participants' paychecks and using those funds to reduce its own financial obligations to the Plan, JPMorgan caused the Plan to engage in transactions that constituted a direct or indirect exchange of Plan assets for the benefit of a party in interest—namely, itself—in violation of 29 U.S.C. § 1106(a)(1). JPMorgan is a party in interest, as defined under 29 U.S.C. § 1002(14), because it is both the Plan sponsor and a fiduciary exercising discretionary authority over the Plan's assets.

78. By retaining the amounts of the tobacco surcharges, JPMorgan increased its own corporate assets and saved the money it would otherwise have had to contribute to the Plan and shifted financial responsibility to fund the Plan from itself to the participants. In doing so, it dealt with Plan assets for its own benefit, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), which prohibits fiduciaries from engaging in self-dealing. The surcharges should have supplemented, not displaced, JPMorgan's contributions. By retaining and misusing the surcharges, JPMorgan benefitted from the float at the expense of the Plan and its participants, leaving the Plan with less than what it should have received under its governing documents.

79. Defendants breached their fiduciary duties by: administering a noncompliant Plan; failing to make available the "full reward" to participants; failing to properly disclose material information about the wellness programs to participants—specifically, the right to include their own physician in the development of an alternative standard—thereby depriving them of the ability to make informed choices; acting on behalf of a party whose interests were adverse to the Plan and its participants, in violation of ERISA § 406(b)(2); and failing to prudently review the terms of the

Plan, the surcharge program, and the communications sent to participants, for years, to ensure compliance with ERISA's requirements. These breaches caused Plaintiff and the Class to incur unlawful surcharges that shifted costs to participants and away from Defendants. Had Defendants complied with their fiduciary duties, they would have noticed the deficiencies and taken steps to correct the behavior. More importantly, they would have ensured that the surcharge proceeds were deposited into the Plan as additional funding, and safeguarded participants from bearing unlawful costs.

80. As a direct and proximate result of these fiduciary breaches, members of the Class lost millions of dollars in the form of unlawful surcharges that were deducted from their paychecks.

81. Plaintiff is authorized to bring this action on a representative basis on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2). Defendants are liable to: make good to the Plan all losses resulting from its breaches, including but not limited to any and all equitable and remedial relief as is proper, disgorge all unjust enrichment and ill-gotten profits, and to restore to the Plan or a constructive trust all profits acquired through its violations, as alleged herein.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY (INDIVIDUAL RELIEF)**
**(Violation of ERISA §§ 404, 406 and 409, 29 U.S.C. §§ 1104, 1106 and 1109)**

82. Plaintiff re-alleges and incorporates herein by reference allegations 1–58 of this Complaint.

83. At all relevant times, Defendants were administrators of the Plan and were fiduciaries in that they exercised discretionary authority and control over the management of the Plan's assets.

84. ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of

the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1); 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

85. Instead of loyally and prudently acting in the best interests of Plan participants, Defendants chose to use Plan assets to benefit JPMorgan, to the detriment of Plaintiff and other similarly situated individuals, by unlawfully withholding millions of dollars in tobacco surcharges from participants' paychecks. Year after year, Defendants administered a noncompliant Plan and wellness program. Defendants administered the Plan by exercising discretionary authority over how surcharge proceeds were handled, whether participants would receive the "full reward," and by communicating with participants about their rights under the Plan.

86. Upon information and belief, the Benefits Executive controlled and disseminated to all employees the benefit guides and other Plan communications discussing the premium differential but failed to notify them of all the ways by which they could avoid the entire year of surcharges. Defendants further failed to conduct periodic or prudent reviews of the surcharge and wellness program, and the related communications, to ensure compliance with ERISA and its regulations. Instead, Defendants allowed a structurally defective wellness program to persist year after year, even though it resulted in discriminatory surcharges and deprived the Plan of the employer contributions it should have received.

87. Defendants breached their fiduciary duties by administering a Plan that did not conform with ERISA's anti-discrimination requirements. They acted disloyally by using ill-gotten funds to shrink JPMorgan's financial contributions. They also failed to properly notify participants, year after year, of a compliant wellness program and failed to review the terms of the

Plan to ensure compliance. These breaches are incompatible with ERISA's core fiduciary mandates.

88. As a result of the unlawful surcharges, Defendants caused the Plan to enrich JPMorgan at the expense of the Plan. By deducting these amounts directly from participants' paychecks without properly administering a compliant wellness program, Defendants secured financial savings for JPMorgan while participants bore increased costs. The structure of the program ensured that "all similarly situated individuals" could not obtain the "full reward" for the entire plan year, and Defendants' communications failed to disclose participants' rights to a reasonable alternative standard. In this way, Defendants transformed what should have been an employer-funded plan contribution into an unjust enrichment for itself, contrary to 29 U.S.C. § 1104(a)(1)(A).

89. Further, by withholding unlawful tobacco surcharges from participants' paychecks and using those funds to reduce JPMorgan's financial obligations to the Plan, Defendants engaged in transactions that constituted a direct or indirect exchange of Plan assets for the benefit of a party in interest—namely, JPMorgan—in violation of 29 U.S.C. § 1106(a)(1). JPMorgan is a party in interest, as defined under 29 U.S.C. § 1002(14), because it is both the Plan sponsor and a fiduciary exercising discretionary authority over the Plan's assets.

90. By retaining the amounts of the tobacco surcharges, Defendants increased JPMorgan's own corporate assets.

91. Defendants breached their fiduciary duties by: administering a noncompliant Plan; failing to make available the "full reward" to participants; failing to properly disclose material information about the wellness programs to participants—specifically, the right to include their own physician in the development of an alternative standard—thereby depriving them of the ability

to make informed choices; acting on behalf of a party whose interests were adverse to the Plan and its participants, in violation of ERISA § 406(b)(2); and failing to prudently review the terms of the Plan, the surcharge program, and the communications sent to participants, for years, to ensure compliance with ERISA's requirements. These breaches caused Plaintiff and the Class to incur unlawful surcharges that shifted costs to participants and away from Defendants. Had Defendants complied with their fiduciary duties, they would have noticed the deficiencies in the program and taken steps to correct the behavior. More importantly, they would have ensured that the surcharge proceeds were deposited into the Plan as additional funding, and safeguarded participants from bearing unlawful costs.

92. As a direct and proximate result of these fiduciary breaches, members of the Class lost millions of dollars in the form of unlawful surcharges that were deducted from their paychecks.

93. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff and the Class seek individual equitable relief necessary to redress Defendants' fiduciary breaches, including but not limited to restitution, surcharge, disgorgement, a constructive trust over improperly retained funds, and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A. An Order certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative for the Class, and appointing the undersigned to act as Class Counsel;

B. A declaratory judgment that the unlawful and discriminatory tobacco surcharges imposed on participants violate ERISA's anti-discrimination provisions set forth in ERISA § 702, 29 U.S.C. § 1182;

C. An Order instructing Defendants to reimburse all persons who paid the unlawful and discriminatory surcharge;

D. A declaratory judgment that Defendants breached their fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, instituting a surcharge on participants without offering a reasonable alternative standard in violation of ERISA's anti-discrimination provisions and for failing to notify participants of an alternative standard, and for failing to adequately monitor the terms of the Plan, the surcharge, and the wellness program, as well as communications with participants, to ensure they complied with ERISA and the applicable regulations;

E. An Order requiring Defendants to provide an accounting of all prior payments of the surcharges under the Plan;

F. Declaratory relief as necessary and appropriate, including an Order that Defendants' program was unlawful and that it should not further violate the duties, responsibilities, and obligations imposed on them by ERISA with respect to the Plan and ordering Defendants to remit all previously collected surcharges;

G. Disgorgement of any benefits or profits Defendants received or enjoyed due to the violations of ERISA § 702, 29 U.S.C. § 1182(b);

H. Restitution of all surcharge amounts Defendants collected;

I. Surcharge from Defendants totaling the amounts owed to participants and/or the amount of unjust enrichment obtained by Defendants as a result of its collection of the unlawful and discriminatory tobacco surcharges;

J. Relief to the Plan from Defendants for their violations of ERISA § 404, 29 U.S.C. § 1104, under 29 U.S.C. § 1109, including a declaration that the tobacco surcharges are unlawful; restoration of losses to the Plan and its participants caused by Defendants' fiduciary violations; disgorgement of any benefits and profits Defendants received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to members who paid the surcharges; removal and replacement of the Plan's fiduciaries, and all appropriate injunctive relief, such as an Order requiring Defendants to stop imposing the unlawful and discriminatory surcharges on participants in the future.

K. An award of pre-judgment interest on any amounts awarded to Plaintiff and the Class pursuant to law;

L. An award of Plaintiff's attorneys' fees, expenses, and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

M. Any other relief the Court determines is just and proper.

Dated: January 16, 2026

Respectfully submitted,

**SIRI & GLIMSTAD LLP**

/s/ *Jack Spitz*

Jack Spitz(Bar No. 248632019)
Oren Faircloth (*pro hac vice* forthcoming)
8 Campus Drive, Suite 105 PMB#161
Parsippany, New Jersey 07054
Tel: (212) 532-1091
E: jspitz@sirillp.com
E: ofaircloth@sirillp.com

*Attorneys for Plaintiff and the Proposed Class*